## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      Case No. 18-20686

v.                                 Hon. Denise Page Hood

PETER RAYMOND NWOKE,

        Defendant.

_____/

## ORDER REGARDING MOTIONS IN LIMINE OR TO EXCLUDE
## (ECF Nos. 122, 134, 150)

## I.      BACKGROUND

On October 11, 2018, an Indictment was filed alleging Defendant Peter Raymond Nwoke with:  False Statement on Tax Returns, 26 U.S.C. § 7206(1) (Counts One, Two, Three, Five, Six) and Failure to Pay Income Taxes, 26 U.S.C. § 7203 (Count Four).  (ECF No. 1) The charges stem from (1) filing tax returns that underreported Nwoke' income and tax liability in tax years 2011, 2012 and 2013; and (2) failing to pay the underreported tax amounts for those same years.

A jury trial was held beginning on September 20, 2022, ending in a declaration of a mistrial on October 27, 2022.  This matter is now before the Court on Motions in Limine or to Exclude filed by both parties.

## II.    ANALYSIS

### A.    Government's Motion in Limine Requiring Attorney Testimony and Production of Documents (ECF No. 122)

The Government seeks the testimony of Attorney Clinton Mikel, and his law firm, The Health Law Partners, to be presented at the second trial, along with production of documents relating to the registration paperwork to incorporate Divine Medical Center, P.C.  Nwoke opposes the motion asserting the testimony and documents sought are not relevant to whether Nwoke underreported his income and tax liabilities during the years at issue.

The Government asserts that Divine Medical Center received Medicare payments and income in 2012 and 2013 which were not reflected on Nwoke's corresponding tax returns.  Divine Medical Center was organized, registered and incorporated with the Michigan Department of Licensing and Regulatory Affairs ("LARA") in August 2012 by Attorney Mikel.  The documents submitted by Attorney Mikel lists Dr. Carmen Cardona, an employee of Nwoke, as both the registered agent and sole incorporator of Divine Medical Center.  The documents indicate that the incorporation documents were faxed from Nwoke's office then filed via fax by Attorney Mikel's office the following day.  (ECF No. 122, PageID.3047-.3049)

At the first trial, Nwoke testified that Divine Medical Center belonged to Dr. Cardona.  (ECF No. 101, TR, PageID.2328, .2336). Nwoke testified that Attorney

Mikel led a meeting with Dr. Cardona, him, and other individuals to discuss forming Divine Medical Center.  Nwoke further testified that Attorney Mikel was in charge of the bank account for Divine Medical Center.  Nwoke testified that he did not make any money based on Dr Cardona's Medicare billings at Divine Medical Center. (ECF No. 100, TR, PageID.2260)

Dr. Cardona also testified at the first trial stating that she had signed and handed Nwoke a document for a different entity and identified that signature page as the one attached to the Divine Medical Center paperwork filed with LARA by Attorney Mikel.  (ECF No. 106, TR, PageID.2610) Dr. Cardona testified that she did not attend any meeting with a lawyer and denied any ownership and control over Divine Medical Center, its bank accounts and any income it received.  *Id*.  Dr. Cardona has since signed a declaration denying in detail the assertions Nwoke made at trial about Divine Medical Center and disavowing any attorney-client relationship with Attorney Mikel.  (ECF No. 122, PageID.3050-.3051)

The Government asserts that Attorney Mikel has been subpoenaed to testify at the second trial as to who hired him and provided the registration paperwork filed with LARA to incorporate Divine Medical Center, as well as any role he played in forming or managing Divine Medical Center.  Attorney Mikel advised the Government that pursuant to Michigan Rule of Professional Conduct 1.6, he will be compelled to invoke the "client-lawyer confidentiality" and refuse to testify

3

because his client has instructed Attorney Mikel to consider everything about their relationship to be both secret and confidential, including the client's identity.

Nwoke responds that the information the Government seeks is not relevant to whether Nwoke committed the charged offenses. He argues that any alleged false testimony by Nwoke at the first trial regarding a meeting or providing documents to the attorney does not make any of the charged counts more likely to have been committed. Nwoke asserts that the identity of Attorney Mikel's client is not relevant to whether Nwoke falsified tax documents and does not prove who owned Divine Medical Center. The purpose of Attorney Mikel's roles, duties or responsibilities related to Divine Medical Center are also irrelevant because this information does not make it more or less likely that Nwoke committed the offenses charged. Nwoke further asserts that Attorney Mikel cannot say for certain who sent the fax unless he witnessed it, and any conversation with his client about the fax would be privileged. The relevant inquiry Nwoke claims is who prepared the documents and instructed Attorney Mikel to file it with LARA, which Nwoke claims would be subject to the attorney-client privilege. Nwoke claims that the issue of whether Nwoke "switched" the document and affixed Dr. Cardon's signature page without her consent is a contested issue of credibility and should be decided by a jury.

Nwoke claims that the Government is attempting to obtain information to

prove an uncharged conduct, that Nwoke committed perjury during his testimony in the first trial.  The information as to who attended the meeting can be done without Attorney Mikel having to testify.  Compelling an attorney to discuss their representation should be avoided at all costs.

The Government replies that the full and accurate identification of Nwoke's sources and amounts of income, and whether it was intentionally underreported by Nwoke on his tax returns is a critical, core issue relative to each of the six counts charged.  Any attempt to conceal the sources or amounts of income is relevant to show knowledge, willfulness, and intent.  The Government argues that the testimony and documents related to the formation, incorporation, registration and management of Divine Medical Center will tend to show who in fact exercised ownership, dominion and control over the medical practice as a source of income and income distributions and whether Nwoke used this as a source of income. Information as to how Attorney Mikel received the paperwork for Divine Medical Center, will tend to show whether intentional deception was involved and bear on proving knowledge, willfulness and intent.  The Government claims that any attorney-client privilege has been waived by Dr. Cardona, in that she asserts she never hired Attorney Mikel.  Nwoke has also waived the attorney-client privilege by testifying that Divine Medical Center was Dr. Cardona's, that Attorney Mikel led the meeting to discuss the incorporation of Divine Medical Center and that he

did not make any money from Divine Medical Center.

Rule 401 of the Rules of Evidence provides:

Evidence is relevant if:
(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action.

Fed. R. Evid. 401.

Nwoke is charged with filing false returns and failing to pay taxes based on unreported income. The issue of whether Nwoke used Divine Medical Center as a source of income is relevant. The evidence and testimony during the first trial shows that Nwoke asserted he received no income from Divine Medical Center and that he claimed Dr. Cardona owned the practice. Dr. Cardona denied that she owned Divine Medical Center and that she did not direct Attorney Mikel to file any documents with the State to register and incorporate the practice on her behalf. Based on the testimony by Nwoke and Dr. Cardona at trial, the Court finds any ownership and any revenue by Divine Medical Center is relevant if it can be shown that Nwoke in fact caused Attorney Mikel to incorporate Divine Medical Center in order to hide any income he may have gained from Divine Medical Center.

As to attorney client privilege, the privilege is recognized in the federal forum. *See, Fisher v. United States*, 425 U.S. 391 (1975); Rule 501, Federal Rules of Evidence. The burden of establishing the existence of the privilege rests with the person asserting it. *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447,

450–51 (6th Cir. 1983).

In this case, Dr. Cardona has expressly disavowed hiring Attorney Mikel to form Divine Medical Center, even though her name is the sole incorporator on the documents filed with LARA. In light of this statement, if Dr. Cardona was in fact the client, she has expressly disavowed any such privilege with Attorney Mikel. If Nwoke is in fact the client, he has also disavowed any such privilege with his testimony at trial. Attorney Mikel is free to testify and to produce any documents subpoenaed by the Government if either Cardona or Nwoke is his client.

However, if neither Cardona nor Nwoke is Attorney Mikel's client, the identity of the client is not subject to the attorney client privilege. The general rule is that disclosure of the identity of a client is not within the protective ambit of the attorney-client privilege. *Id.* at 455. If neither Dr. Cardona nor Nwoke is Attorney Mikel's client, then the Sixth Circuit has ruled that the attorney must seek an ex parte hearing with the Court to reveal the identity in order for the Court to determine whether an exception to the attorney client privilege not to disclose the identity of the client applies. If Attorney Mikel fails to do so (and he has not done so to date), then the identity must be revealed. The attorney must also show with specificity and evidence that the exceptions to the general rule of revealing the identity of a client must be upheld. Any unsupported blanket assertions of privilege stated by the attorney in order to hide the identity of a client are strongly

7

disfavored.  The exceptions are: 1) the attorney has the burden of demonstrating a "strong possibility" that disclosure of the identity of a client would implicate that client in the very manner for which legal advice had been initially sought; and 2) the attorney's disclosure of the identity of a client would amount to a disclosure of a confidential communication. *Id*.

Attorney Mikel has the burden of proof as to whether his client falls under any of the exceptions not to disclose his or her identity.  If Attorney Mikel fails to testify and produce the subpoenaed documents without seeking a hearing before this Court as to any claimed attorney client privilege and fails to carry his burden as noted above, then he may be subject to sanctions if he does not testify at trial or produce the documents subpoenaed by the Government.  If Nwoke is the client, then Nwoke has waived the privilege based on his testimony at the first trial as to how Divine Medical Center was formed and whether any monies from the practice went to Nwoke.  If Nwoke is not the client, Nwoke has no standing to argue as to whether Attorney Mikel must testify or not to produce the documents subpoenaed by the Government. The Government's Motion in Limine to compel Attorney Mikel to testify at trial and produce the documents subpoenaed is granted, unless as noted above.

**B.    Nwoke's Motion in Limine (ECF No. 134)**

Nwoke seeks to exclude the testimony of the Government's proposed expert

witnesses, Dr. Daniel Berland, as well as Supervisory Special Agent Peter Hayes, who will testify as experts into prescription drug diversion. Nwoke asserts that the testimonies would be collateral to the issue of whether or not Nwoke received income that was not declared nor whether his statements on his returns were false. The attempt is to suggest that Nwoke is a drug dealer without any direct proof that he was selling prescriptions and that the drugs had been diverted from the patients. Neither witness can testify that there was any drug money obtained by Nwoke that was not declared. Nwoke claims the testimonies would be prejudicial because the testimonies inferring he is a drug dealer is substantially outweighed by the unfair prejudice to Nwoke. If these witnesses were allowed to testify, Nwoke would seek a delay in the proceedings in order to find an expert to counter the Government's witnesses, which would lead to an unduly delay of the trial.

The Government responds that both witnesses have specialized knowledge that Nwoke overwhelmingly prescribed "valuable" and "medically unnecessary" controlled substance medications which were the types of drugs that pill dealers, addicted patients and street intermediaries sought "in exchange for cash." (ECF No. 134, PageID.3169, .3172; PageID.3163) They will describe the street market cash prices typically paid to doctors and other practitioners for prescriptions. *Id*. at PageID.3172, 3163. The Government claims the testimonies support a calculation of how much cash Nwoke potentially received for writing these controlled

substance prescriptions.  These testimonies would direct address a central issue in this case–the taxable source of large cash deposits made to Nwoke's bank accounts which Nwoke neither declared income nor paid income tax.

At the first trial, the Court allowed the Government to prove Nwoke earned undeclared income calling on a witness who testified that he personally paid Nwoke $500 cash per prescription for fraudulent controlled substance prescriptions in the names of patients residing at Jenkins' adult foster care homes.  The Court also allowed corroborative testimony by calling Special Agent Peter Hayes of the FBI.  Hayes explained aspects of the street market tied to purchasing fraudulent prescriptions, filling them, and selling the resultant pills and medication for a profit. Nwoke does not argue that Jenkins and Hayes' testimonies during the first trial were not relevant, nor that Hayes' testimony was improper.

The Government asserts that at the first trial, Nwoke objected to Hayes' testimony as "[n]ot relevance" but rather "foundation," because Hayes "doesn't have any experience acting as [a medical] expert."  (ECF No.  94, TR, PageID.1648). The Court did not allow Hayes to testify about medical aspects of the prescriptions that were beyond his training and experience. (ECF No. 94, TR, PageID.1649).  The Government intends to call Dr. Berland, a well-qualified teacher and medical practitioner at the University of Michigan, to testify to medical aspects of the prescriptions that are beyond the expertise of Hayes. Dr. Berland

will testify that no medical literature supports Nwoke's explanation at trial that he switched from the reformulated version of Oxycontin to other sought-after drugs that maintained heightened street market case value. Dr. Berland will also testify as to how much a patient visit would cost–$100 per visit–as opposed to Nwoke's testimony that he was paid $500 per patient visit. Dr. Berland and Hayes will testify that Nwoke's prescription patterns and prescribing practices were not medically supported, but that the patterns and practices were indicative of someone writing prescriptions because of their street market value.

Nwoke replies that Dr. Berland and Hayes never talked to a single patient and did not examine the patient files to determine if the complaints led to the prescriptions. Nwoke claims the testimonies are mere speculation and offered to vouch for the testimony of Jenkins and Ms. Dowl who were not believed by the jury.

Rule 702 of the Rules of Evidence governs the admissibility of expert testimony. The trial court must determine whether the expert meets three requirements: 1) that the witness must be qualified by "knowledge, skill, experience, training or education;" 2) the proffered testimony is relevant and "will assist the trier of fact to understand the evidence or to determine a fact in issue;" and, 3) the testimony is reliable in that it is based on scientific, technical or other specialized knowledge. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litigation,*

527 F.3d 517, 529 (6th Cir. 2008).   As to the third requirement, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court set forth factors to be considered in determining whether to admit expert testimony as reliable.   The four factors are: 1) whether a theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error in using a particular and scientific technique and the existence and maintenance of standards controlling the technique's operation; and 4) whether the theory or technique has been generally accepted in the particular scientific filed.  *Id.* at 593-94.  The factors are neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The factors will often be appropriate in determining reliability.  *Id.* at 152.   The trial court has broad latitude to determine whether these factors are reasonable measures of reliability in a particular case.  *Id.* at 153.  The test of reliability is "flexible," and the *Daubert* factors do not constitute a definitive checklist or test and may not be dispositive in every case.  *In re Scrap Metal,* 527 F.3d at 529.

As to the first factor under Rule 702, the experts' qualifications are not challenged by Nwoke.   Based on the curriculum vitae of Dr. Berland he is qualified to testify as an expert on practices by doctors as to prescribing

medications, how the changes in oxycontin affected the prescription pattern by Nwoke and the cost of office visits.  As to Hayes, the Court previously allowed Hayes to testify as an expert, and so the Court so rules again.

Regarding the second factor, relevancy and whether such testimony assists the trier of fact, the Court finds that the cost of prescribing prescriptions by Nwoke could show that the money deposited to his account which were not disclosed as income, could have come from selling prescriptions.

The third factor, reliability, has also been met, based on Dr. Berland's "specialized knowledge" in prescribing drugs.  The factors in *Daubert* are not raised by Nwoke and are not relevant in this case since the testimonies are not based on scientific evidence, but rather on the expert's specialized knowledge, which is expressly allowed in Rule 702.

Weighing the factors, the Court finds that the expert testimonies identified by the Government should be allowed to testify.  Nwoke's Motion in Limine to exclude the testimonies of the Government's two experts is denied.  Nwoke is able to cross-examine the expert witnesses as to how they reached their opinions.

If Nwoke wishes to add rebuttal experts on this issue, then he may do so under the Criminal Justice Act.  The CJA provides that attorneys for indigent defendants can petition a court for federal funds to retain an investigator, expert witness, or professional whose services the attorney needs to provide adequate

representation. 18 U.S.C. § 3006A(e)(1). To obtain these funds, an indigent defendant must show that "(1) such services are necessary to mount a plausible defense, and (2) without such authorization, the defendant's case would be prejudiced." *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002); *United States v. Roberts*, 919 F.3d 980, 985–86 (6th Cir. 2019). A district court need not grant an indigent's motion under the CJA on the off chance that the requested services might turn up something. *Id*. at 406.

The District's Criminal Justice Act Plan provides that a defendant may request investigative expert services in an ex parte application to the Court as provided in 18 U.S.C. § 3006A(e)(1). "Upon the finding that the services are necessary, and the person is financially unable to obtain them, the Court must authorize counsel to obtain the services." CJA Plan for E.D. Mich., § XV.A. The requests must not be disclosed and submitted in an ex parte motion to the Court. *Id.* The fees are subject to a maximum amount and certain restrictions which can be found on the Court's website. Any proposed expert by Nwoke is subject to Fed. R. Evid. Rule 702 and defense's disclosure requirements under Fed. R. Crim. P. Rule 16.

Rule 702 of the Rules of Evidence provides testimony by an expert witness:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) *the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue*;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  It is the defendant's burden to show that the expert witness is required for a plausible defense as required under the CJA set forth above.

### C.    Government's Motion to Exclude Defendant Expert Testimony or Provide Discovery (ECF No. 150)

The Government seeks to exclude defense expert testimony because of Nwoke's failure to comply with Rule 16(b)(1)(C).  Alternatively, the Government requests a court order compelling the production of signed written summaries of any expert testimony, excluding Nwoke's own testimony as an expert, that he intends to offer at trial.  No response to this motion was filed by Nwoke.

The Government claims that it has requested from Nwoke, disclosures under Rule 16(b)(1)(C) of a written summary for any expert testimony Nwoke intends to offer at trial, including a written summary from Nwoke himself if he were to testify as an expert at trial.  (See ECF No. 150, Ex. 1) At the first trial, while testifying, Nwoke offered an expert opinion that documented problems with the reformulated version of OxyContin 80 mg provided medical justification for doctors to switch patients from the reformulated, abuse-resistant version of OxyContin 80mg, and

instead prescribe Oxycodone 30mg and Opana 40mg pills that are not resistant to

crushing, snorting, and injecting. (See ECF No. 101, PageID.2300). At his second

trial, Nwoke indicates he has an intention to testify as an expert on this issue. (See

ECF No. 139, PageID.3241) The Government seeks an expert report as to Nwoke's

basis for his opinion that the change of prescription from OxyContin to Oxycodone

was justified. It is noted that at the first trial, the Government did not object to

Nwoke's testimony on this issue.

Rule 16 of the Rules of Criminal Procedure governs expert witnesses. As to

a defendant's disclosure as to expert witnesses, Rule 16(b)(1)(C) provides:

> (C) Expert Witnesses.
> (I) Duty to Disclose. At the government's request, the defendant must
> disclose to the government, in writing, the information required by
> (iii) for any testimony that the defendant intends to use under Federal
> Rule of Evidence 702, 703, or 705 during the defendant's case-in-chief
> at trial, if:
> • the defendant requests disclosure under (a)(1)(G) and the
> government complies; or
> • the defendant has given notice under Rule 12.2(b) of an intent to
> present expert testimony on the defendant's mental condition.
> (ii) Time to Disclose. The court, by order or local rule, must set a time
> for the defendant to make the defendant's disclosures. The time must
> be sufficiently before trial to provide a fair opportunity for the
> government to meet the defendant's evidence.
> (iii) Contents of the Disclosure. The disclosure for each expert witness
> must contain:
> • a complete statement of all opinions that the defendant will elicit
> from the witness in the defendant's case-in-chief;
> • the bases and reasons for them;
> • the witness's qualifications, including a list of all publications
> authored in the previous 10 years; and
> • a list of all other cases in which, during the previous 4 years, the

witness has testified as an expert at trial or by deposition.

Fed. R. Crim. P. 16.

At the first trial, Nwoke responded to questions regarding OxyContin and

Oxycodone as follows:

> Q.   There was a time that you stopped prescribing OxyContin and
>       you went to Oxycodone, I believe. Why did you do that?
> A.    Well, the formulation – the formulation that OxyContin was –
>       actually, that was the first time I even know that OxyContin
>       was – they changed the formulation because patients were
>       having trouble swallowing the medication.
>       Actually, one patient said she choked. She have to, you know,
>       drink a lot of water, keep massaging her throat until the
>       medication went down.   I had another patient that had
>       something called partial small bowel obstruction.  So patients
>       were having problem with the new formulation.
> Q.   So you -- so is that why you switched?
> A.    That's why I switched.
>       And now, when – down the road, like, I think it was 2014 or
>       '15, when the company finally stopped the medication, that's
>       when they published their own – they do sponsored-research
>       about that medication and they decide was consistent with what
>       my patients were suffering.
>       Doctors were – from their own research, doctors were switching
>       because of the same side effects it was giving to their patients.

(ECF No. 101, PageID.2300-.2301)

Rule 703, Bases of an Expert, provides,

An expert may base an opinion on facts or data in the case that the
expert has been made aware of or personally observed. If experts in
the particular field would reasonably rely on those kinds of facts or
data in forming an opinion on the subject, they need not be admissible
for the opinion to be admitted. But if the facts or data would otherwise
be inadmissible, the proponent of the opinion may disclose them to

the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.  The Notes of the Advisory Committee provides, "[f]acts or data upon which expert opinions are based may, under the rule, be derived from three possible sources. The first is the firsthand observation of the witness, with opinions based thereon traditionally allowed. A treating physician affords an example." The Notes further provide,

> [A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

Fed. R. Evid. Rule 703, Adv. Comm. Notes.

Nwoke's testimony appears to be based on his experience as to his patients' reaction to certain drugs.  He does refer to publication regarding the reason why the company stopped the medication in 2014 or 2015.  It is unclear from Nwoke's previous testimony whether he changed the patients' medication based on the company's research or from his own experience with his patients who were unable to tolerate OxyContin.  If Nwoke changed the medication based on the company's research, Nwoke must provide the Government with the publication he relied upon to change the medication from OxyContin to Oxycodone.  However, if Nwoke

changed the medication because his patients were unable to tolerate the drug without Nwoke relying on the company's research, then disclosure is not required since Nwoke is relying upon his own experience with his patients. The Government can either voir dire Nwoke on his experience regarding prescribing the drugs prior to this specific testimony to determine if Nwoke has the experience to justify the change of prescriptions, or the Government may proceed in testing Nwoke's experience on prescribing such drugs on cross-examination. The Government's Motion to Exclude is denied without prejudice pending further testimony at trial by Nwoke.

## III.    CONCLUSION / ORDER

For the reasons set forth above,

IT IS ORDERED that the Government's Motion in Limine compelling Attorney Clinton Mikel to testify at trial and produce the documents **(ECF No. 122) is GRANTED**, unless Attorney Mikel can show by sufficient evidence and not conclusory statements that the exception to revealing his client's identity falls under an exception as set forth above.

IT IS FURTHER ORDERED that Defendant Peter Nwoke's Motion in Limine as to the Government's Experts **(ECF No. 134) is DENIED**.

IT IS FURTHER ORDERED that the Government's Motion to Exclude as to Defendant Peter Nwoke's expert opinion **(ECF No. 150)** is **DENIED without prejudice** subject to Nwoke's testimony at trial as set forth above.

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED:  May 14, 2025